PDK/FRAUD: USAO 2024R00444



KOH

**U.S. Department of Justice**

*Criminal Division*
*Fraud Section*

*United States Attorney*
*District of Maryland*
*Southern Division*

*Matt Kahn, Trial Attorney*
*Brandon Burkart, Trial Attorney*
*Criminal Division, Fraud Section*
*Matthew.Kahn2@usdoj.gov*
*Brandon.Burkart@usdoj.gov*

*Mailing Address:*
*1400 New York Ave., N.W.*
*Washington, D.C. 20005*

*Office Location:*
*1400 New York Ave., N.W.*
*Washington, D.C. 20005*

*DIRECT: 202-305-1648*
*MAIN: 202-514-2000*
*FAX: 202-514-3708*

*Patrick D. Kibbe*
*Assistant United States Attorney*
*Patrick.Kibbe@usdoj.gov*

*Mailing Address:*
*6500 Cherrywood Lane, Suite 200*
*Greenbelt, MD 20770-1249*

*Office Location:*
*6406 Ivy Lane, 8th Floor*
*Greenbelt, MD 20770-1249*

*DIRECT: 301-344-0872*
*MAIN: 301-344-4433*
*FAX: 301-344-4516*

**August 29, 2024**

Joshua A. Levy, Esq.
Monique T. Abrishami, Esq.
Juliana M. Andonian, Esq.
Levy Firestone Muse LLP
900 17th Street N.W., #1200
Washington, D.C. 20006

> Re:   United States v. Darryl F. Britt
>       Criminal No. [TBD]

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement ("Agreement") that has been offered to your client, Darryl F. Britt ("Defendant"), by the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Maryland (collectively, the "Government"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **5:00 p.m. ET on August 30, 2024**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1.      The Defendant agrees to waive his right to be indicted by a Grand Jury and agrees to plead guilty to Count One of a one-count Information to be filed against the Defendant, which will charge him with Conspiracy to Commit Bribery of a Public Official, in violation of 18 U.S.C. § 371. The Defendant admits that the Defendant is, in fact, guilty of this offense and will so advise the Court.

## Elements of the Offense

2.     The elements of the offense to which the Defendant has agreed to plead guilty, and which the Government would prove beyond a reasonable doubt if the case went to trial, are as follows: That, on or about the date alleged in the Information, in the District of Maryland and elsewhere, (1) the Defendant and at least one other person entered into the unlawful agreement charged in the Information, (2) the Defendant knowingly and willfully became a member of the conspiracy, (3) one of the members of the conspiracy committed at least one of the overt acts charged in the Information, and (4) the overt act was committed in furtherance of some objective of the conspiracy.

## Penalties

3.     The maximum penalties provided by the statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|-------|---------|----------------|----------------|--------------------|--------------|--------------------|
| 1 | 18 U.S.C. § 371 | N/A | 5 years | 3 years | $250,000, or the greater of twice the gross gain or twice the gross loss | $100 |

a.     Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.     Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.     Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.     Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e.     Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.    Collection of Debts:  If the Court imposes a fine or restitution, the Government will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes the Government to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by the Government.

## Waiver of Rights

4.    The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.    If the Defendant had pleaded not guilty and persisted in that plea, the Defendant would have had the right to have a grand jury consider the charge in the Information against him. The Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, the Government, and the Court all agreed.

b.    If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.    If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses.  The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.    The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

      e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

      g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

      h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

      5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551 through 3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.      The Government and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

## Count One (Conspiracy to Commit Bribery of a Public Official)

a.      The Government and the Defendant agree that the base offense level is **12**, pursuant to U.S.S.G. §§ 2C1.1(a)(2) and 2X1.1(a), because the Defendant is not a public official.

b.      The Government and the Defendant agree that a **2**-level increase applies, pursuant to U.S.S.G. § 2C1.1(b)(1), because the offense involved more than one bribe.

c.      The Government and the Defendant agree that at least a **16**-level increase applies, pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(I), because the value of the benefit received was between at least $1.5 million and $3.5 million.  The Government reserves the right to argue at sentencing that the value of the benefit received was greater than $3.5 million, which would result in a higher total offense level.

d.      The Government and the Defendant agree that a **4**-level increase applies, pursuant to U.S.S.G. § 2C1.1(b)(3), because the offense involved a public official in a high-level decision-making or sensitive position.

e.      The Government does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. The Government agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty.  The Government may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, the Government, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

f.      The Defendant reserves the right to argue at sentencing that a **2**-level downward adjustment applies because of the criteria set forth in U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders) have been met. The Government reserves the right to argue at sentencing that this downward adjustment does not apply.

7.      There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.      No other offense characteristics, sentencing guidelines factors, potential departures, or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range, except those specifically reserved in this Agreement.

## Obligations of the Parties

9.      At the time of sentencing, the Government and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). The Government and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that the Government or the Defendant deem relevant to sentencing, including the conduct that is the subject of Count One of the Information.

## Forfeiture

10.      The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

11.      Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: a money judgment in the amount of proceeds the Defendant obtained as the result of his participation in the conspiracy to commit bribery.

12.      The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

13.      The Defendant agrees to assist fully in the forfeiture of the property described above, including fully cooperating in the execution of the money judgment entered by the Court. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the

jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

14.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint.  The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Restitution

15.     The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses.  The Defendant agrees that, pursuant to 18 U.S.C. §§ 3563(b)(2), 3583(d), 3663, and 3663A, the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation.  The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith.  Any payment schedule imposed by the Court establishes only a minimum obligation.  Defendant will make a good faith effort to pay any restitution.  Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time.  The Defendant further agrees that the Defendant will fully disclose to the Government, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation.  The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution.  If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and the Government may seek to be relieved of its obligations under this Agreement.

## Waiver of Appeal

16.     In exchange for the concessions made by the Government and the Defendant in this Agreement, the Government and the Defendant waive their rights to appeal as follows:

a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever.  This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent that such challenges legally can be waived.

b.     The Defendant and the Government knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional

challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

    i.   The Defendant reserves the right to appeal any term of imprisonment that exceeds the statutory maximum; and

    ii.   The Government reserves the right to appeal any term of imprisonment to the extent that it is less than the bottom of the final advisory guidelines range as calculated by the Court at sentencing.

    c.   The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from the Government or any investigating agency.

### Defendant's Conduct Prior to Sentencing and Breach

   17.  Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, the Government, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

   18.  If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) the Government will be free from its obligations under this Agreement; (ii) the Government may make sentencing arguments and recommendations different from those set out in this Agreement; and (iii) in any criminal or civil proceeding, the Government will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that the Government is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea if the Court finds that the Defendant breached the Agreement.

### Court Not a Party

   19.  The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations

8

under this Agreement. Neither the prosecutors, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

<u>Entire Agreement</u>

20.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between the Government and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and the Government other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties, and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Glenn S. Leon
Chief
United States Department of Justice
Criminal Division, Fraud Section

_____

Matt Kahn
Brandon Burkart
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section

Erek L. Barron
United States Attorney
United States Attorney's Office
District of Maryland

_____

Patrick D. Kibbe
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorneys. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorneys, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorneys.

8/30/24
_____
Date

_____
Darryl F. Britt

We are the Defendant's attorneys. We have carefully reviewed every part of this Agreement, including the Sealed Supplement, with the Defendant. The Defendant has advised us that the Defendant understands and accepts the terms of this Agreement. To our knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

9/3/24
_____
Date

_____
Joshua A. Levy, Esq.
Monique T. Abrishami, Esq.
Juliana M. Andonian, Esq.
LEVY FIRESTONE MUSE LLP
*Counsel for the Defendant*

## ATTACHMENT A

## STATEMENT OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

## RELEVANT INDIVIDUALS AND ENTITIES

At all times relevant to the offense:

The Defendant, **DARRYL F. BRITT ("BRITT")**, a Florida resident, was the president of Company 1. Company 1 contracted with government agencies, including the United States Agency for International Development ("USAID"), to provide administrative and technology services. Company 1 maintained its headquarters in Washington, D.C. Since in and around 2004, the U.S. government has obligated approximately $271 million in funds in connection with Company 1's prime contracts with the U.S. government.

CC-1, a Maryland resident, was a contracting officer at USAID, and as such, a public official. USAID was a government agency headquartered in Washington, D.C., which led the United States Government's international development and disaster assistance to save lives, reduce poverty, strengthen democratic governance, and help people emerge from humanitarian crises.

CC-2, a Maryland resident, was the founder, owner, and president of Company 2. Company 2 contracted with government agencies, including USAID, to provide consulting and other services and maintained its headquarters in Towson, Maryland. At times, Company 2 also provided contract support to USAID in connection with its mission to provide humanitarian aid, such as a $100 million purchase agreement for humanitarian aid and support across Ukraine. CC-3 was friends with CC-2. At times, CC-2's company, Company 2, hired Company 3, CC-3's company, and Company 1, **BRITT**'s company, as subcontractors on USAID contracts. Since 2015, the U.S. government has obligated approximately $198 million in funds in connection with Company 2's prime contracts with the U.S. government.

CC-3, a Maryland resident, was the president of Company 3, which contracted with U.S. government agencies to provide Information Technology services, and which maintained its headquarters in Fulton, Maryland. CC-3 was friends with **BRITT** whom he introduced to Coconspirator ("CC") 1. At times, **BRITT**'s company, Company 1, hired Company 3, CC-3's company, as a subcontractor on government contracts.

██████████████████████████████ CC-4 worked at Company 1 and then was hired by USAID where CC-4 eventually became a contracting officer.

## THE CONSPIRACY TO BRIBE A PUBLIC OFFICIAL

Between in and around 2013 and in and around 2023, **BRITT** and his coconspirators bribed CC-1, a public official, repeatedly—in fact, through hundreds of monthly payments and other things of value, including laptops, cellular phones, jobs for relatives, and other gifts and favors—with intent to influence at least one official act, namely, the award of USAID contracts valued at hundreds of millions of dollars to **BRITT**'s company, Company 1, and CC-2's company, Company 2. Moreover, **BRITT** joined the conspiracy to obtain prime contracts through Company 1 with USAID and subcontracts through Company 2. The conspiracy involved at least six contracts valued at approximately $100 million, including:

- between in and around 2013 and in and around 2015, the award of four contracts to Company 1 valued at approximately $45.8 million;

- between in and around 2018 and in and around 2022, the award of two contracts to Company 2 (with Company 1 as a subcontractor) valued at approximately $54 million; as follows:

| | Approximate Contract Timeframe | General Contract Description | Prime Contractor Company | Subcontracts | Approximate Contract Value |
|---|---|---|---|---|---|
| 1) | 4/30/13 - 10/31/18 | Staffing Contract (OAAC1300079) | Company 1 | None | $4.8 million |
| 2) | 9/15/14 - 9/29/20 | Institutional Support (OAAE1400003) | Company 1 | Company 2 | $37.1 million |
| 3) | 3/26/15 - 12/7/15 | Knowledge Management (OAAO1500009) | Company 1 | None | $22,000 |
| 4) | 9/21/15 - 9/20/18 | Communications Support (OAAC1500070) | Company 1 | None | $3.9 million |
| 5) | 9/10/18 - 11/30/23 | Professional Management (7200AA18C00085) | Company 2 | Company 1 / Company 3 | $25.5 million |
| 6) | 6/1/20 - 11/30/22 | Technical Support (7200AA20C00042) | Company 2 | Company 1 | $28.5 million |
| **Approximate Total Value of Contracts** | | | | | **$100 million** |

During and in furtherance of the conspiracy, **BRITT**, through CC-3 and others, funneled a stream of bribe payments to CC-1 in exchange for a pattern of official actions that also benefited, in part, CC-2. As described in more detail below in the following subsections:

A. **BRITT** gave CC-1 money through CC-3 to obtain and retain USAID Contracts 1 through 4;

B. **BRITT** conspired with CC-2—a subcontractor to Company 1—to obtain contracts;

C. **BRITT** continued paying CC-1 while his contracts, including Contract 2 for which CC-2 was a subcontractor, remained active; and

D. **BRITT** and CC-2 sought contracts for which **BRITT'S** company, Company 1, was a subcontractor.

### *BRITT Gave CC-1 Money To Obtain and Retain USAID Contracts 1 Through 4.*

On or about April 30, 2013, Company 1 obtained its first USAID contract. That same day, **BRITT** emailed CC-2 and stated, "My schedule is kind of tight with early morning meetings from 8 – 10 and then on hold to run up to USAID Administrator's Office to close this sole source deal." Once the contract was awarded, **BRITT** agreed to give CC-1 money through CC-3, who also agreed to transfer the money. CC-2 would later join the conspiracy with **BRITT** to obtain USAID contracts.

On or about August 8, 2014, a few weeks before Company 1 was awarded its second USAID contract, **BRITT** discussed with CC-3 ways to conceal the bribe payments. **BRITT** texted CC-3, "[I]f possible, give it to some other third party to give him. That way you can honestly say you never gave him anything … never give anything but cash to you know who."

In addition to payments, CC-1 also sought other things of value from **BRITT** through CC-3. For example, in and around September 2014, after Company 1 was awarded its second USAID contact, for which CC-2 and Company 2 served as a subcontractor, CC-1 asked for an iPhone 6, which **BRITT** provided to CC-3 for CC-1.

In and around August 2015, Company 1 was awarded its fourth USAID contract, after which Company 1 graduated from the U.S. Small Business Administration's ("SBA's") 8(a) Business Development Program, which helps socially and economically disadvantaged businesses receive sole-source (*i.e.*, non-competitive) contracts. **BRITT** and Company 1 later worked as a subcontractor for CC-2 and Company 2 on USAID contracts as a result of bribe payments that CC-3 funneled to CC-1. **BRITT** also continued to discuss bribe payments with CC-3.

For example, in and around October 2015, CC-3 purchased a laptop for CC-1 on behalf of **BRITT**. **BRITT** stated in a text message to CC-3, "You know you can bill me an 'administrative fee'. How much was it?" After CC-3 replied that it was $2,000, **BRITT** stated, "Let's talk today about your next invoice to me."

Likewise, on or about November 10, 2015, **BRITT** texted CC-3, "[CC-1] wanted to get together. I'm only here til[l] noon[.]" CC-3 responded, "Should be in office a little bit after 9." Later in the day, CC-3 texted **BRITT**, "So since August I have sent 2565. Now add the 3700."

On or about December 21, 2015, **BRITT** texted CC-3, "Wondering whether you've chatted with [CC-1] recently[.]" CC-3 replied, "I have. [T]rying to figure out a better reimbursement. I am in the hole." **BRITT** replied, "I am just getting to Bmw dealer on route 40. I'll call you in 10[.]" This conversation related to bribe payments to CC-1.

Two days later (on or about December 23rd), CC-3 sent a follow up text message to **BRITT**. CC-3 stated, "If you can, please bring my check with you." **BRITT** replied, "I have it."

On or about May 24, 2016, **BRITT** texted CC-3, "Forgot to have [Company 1's Accountant] get apple laptop. I just ordered it at [a computer store]. Want to pick it up tomorrow for

13

your friend [CC-1]?"  CC-3 replied, "Sure I will get it in the morning[.]"  **BRITT** replied, "I'll send you the email when it's ready. I've ordered it already[]."  CC-3 replied, "Can you add me as the pickup person?"  **BRITT** replied, "Already did[.]"  CC-3 replied, "Got it[.]"  Later that day, **BRITT** texted CC-3, "Did you give the laptop to [CC-1]?"  CC-3 replied, "I picked it up. Haven't given to [CC-1] yet. [CC-1] will come by tomorrow and get it[.]"  **BRITT** replied, "Ok[.]"

## *BRITT Conspired With CC-2—a Company 1 Subcontractor—to Obtain Contracts.*

In and around early 2017, **BRITT** and CC-2 formed a joint venture between Company 1 and Company 2 to bid on a USAID contract. At the time, Company 2 was a subcontractor on Contract 2, which (as described above) Company 1 had as a prime contractor with USAID.

On or about April 13, 2017, a Company 1 employee emailed CC-1, copying **BRITT**, requesting permission to request a facility security clearance for Company 2 as a subcontractor for Company 1 on Contract 2.  CC-1 approved the request.  As part of the scheme, **BRITT** asked CC-1 to approve a security clearance for Company 2, for its role as a subcontractor on Contract 2, in order to help the joint venture obtain a new USAID contract.  During this period, **BRITT** continued to make bribe payments to CC-1 through CC-3 to obtain USAID contracts.  CC-2 was aware of bribes from BRITT to CC-1.

On or about April 19, 2017, **BRITT** texted CC-3, "I found another usaid opportunity that we can all bid on. We'll have to bid using the jv between [CC-2] and I, since he has pss and we have usaid experience and clearance. Jv will be prime and then we will sub you. Almost size of usaid lab contract."  **BRITT** further texted CC-3, "Not sure if [CC-2's] clearance will come thru in time, but we have TS so hopefully that will count. I wanted to ask [CC-1] about the clearance since we have it and [CC-2] doesn't. Otherwise it could be a few million to you too as sub."  CC-3 replied, "Ok," to which **BRITT** responded, "If you talk to him, tell him my plan[.]"  CC-3 again replied, "Ok," to which **BRITT** responded, "This will be a big one if we win. 50 people. Please ask [CC-1] to approve [CC-2's] security and facility clearance. I spoke to him about this. He is our sub on the lab. We need this to bid on that big usaid job and do the same for you[.]"

Later that day (April 19, 2017), **BRITT** emailed CC-2, CC-3, and others.  **BRITT** stated, "I think we just go on and start planning to bid on this. [CC-3] will chat with [CC-1] when [CC-3] gets a chance. I've given [CC-3] the details … This should be a relatively easy proposal. Only outstanding issue is trying to escalate the [Company 2] facility clearance."

On April 20, 2017, CC-3 texted **BRITT**, "CC-1 is going to try and speed up the clearance process."  **BRITT** replied, "Cool."  The next day (April 21, 2017), **BRITT** emailed CC-2 and another Company 1 employee, stating, "FYI, [CC-1] said he will try and expedite [CC-2]'s clearance."

On or about April 27, 2017, **BRITT** texted with CC-2 and CC-3.  CC-3 first texted the group, "[BRITT] I think you[,] [CC-2,] and I need to meet sometime Friday or the weekend at my office or loneys to discuss [CC-1]'s concerns and how we address them on the response. We have no chance if we don't address his concerns."  **BRITT** responded, "What concerns? First I've heard of them… if we don't have a chance, let's not waste our time.  We have other opportunities just as pressing."  Shortly thereafter, CC-2 responded, "Are we meeting Friday to discuss?", followed by, "And why would we not go after this if [CC-1] is willing to support?"

14

On or about May 1, 2017, **BRITT** and CC-2 finalized the formation of the joint venture between Company 1 and Company 2. Four days later (May 5, 2017), Company 1 submitted the bid on behalf of the joint venture for a USAID contract. Ultimately, the joint venture was not awarded this contract.

### *BRITT Continued Paying CC-1 While His Contracts, Including Contract 2 for Which CC-2 was a Subcontractor, Remained Active.*

In and around July 2017, **BRITT** and CC-3 discussed funneling bribe payments through a bonus to CC-4. CC-3 texted **BRITT**, "Waiting on [CC-1] to get back to me on [CC-4.]" **BRITT** replied, "We can wire tomorrow[.]" Later that day, CC-3 replied to **BRITT**, "[CC-1] is not comfortable with that option. Want as few eyes as possible. Especially women. his words. Will invoice tonight[.] On FaceTime with [CC- 1] now[.]" **BRITT** replied, "Cool I'm good with that[.]"

On or about July 6, 2017, CC-1 sent another government agency a past performance document on behalf of **BRITT** and Company 1, which CC-1 had received from CC-3. The next day, **BRITT** texted CC-3, "I'm going to write a new subcontract for the payment. I'll be having you give me a flat price quote … Then I'm covered for our audit." CC-3 replied, "Ok[.]" Later that day, **BRITT** texted, "[Company 1's Accountant] did wire today." CC-3 replied, "Ok[.]" That same day, Company 1 transferred approximately $19,500 to Company 3 for the bribe payment to CC-1.

### *BRITT and CC-2 Sought Contracts for Which Company 1 Was a Subcontractor.*

On or about September 25, 2017, **BRITT** emailed CC-2, "[CC-1] mentioned some upcoming solicitations so it would be good to have your FCL [Facility Security Clearance] in place … I'd like to do that one a bit different from our current contract structure and have you and [another company] lead that effort, and [Company 1] sub to both of you . . . . I know, this sounds weird[.]"

On or about September 27, 2017, **BRITT** emailed CC-2 about an upcoming meeting with CC-1. CC-2 asked **BRITT**, "What is this meeting regarding?" **BRITT** responded, "A one on one introduction to [CC-1]. Wants to know you re: upcoming opportunities. Introduce you to the family :)".

On or about October 5, 2017, **BRITT** emailed CC-2: "[CC-1] and I are working on a plan for the next few years, that includes [Company 2] and [Company 1 and Company 2 joint venture]. By the way, [CC-3] is not a part of this plan so please keep this between you, [CC-1] and I." Nonetheless, [CC-3] remained in the conspiracy to bribe [CC-1] to obtain USAID contracts with **BRITT** and CC-2.

For example, on or about April 13, 2018, CC-3 texted **BRITT**, "You got 5 minutes? I just got off the phone with [CC-1]. He just happened to call after our text." CC-3 continued, "Man I don't like being used. I feel dirty. I was told not to text you by others. I knew you would feel some way." Shortly thereafter, **BRITT** responded, "We'll fix it. Time to give a plan with [Company 1 and Company 2 joint venture], [Company 2], and [Company 3]. CC-3 then asked, "[BRITT] please give CC-1 a call back.

On or about May 15, 2018, a solicitation for Contract 5 was issued by USAID as a set-aside for 8(a) firms (small businesses). By this time, Company 1 had graduated from the 8(a) program, which is why **BRITT** decided to have CC-2 and Company 2, which remained in the (8)a program, serve as a

contractor on USAID contracts for which **BRITT** and Company 1 would serve as a subcontractor.

The next day (May 16, 2018), in a discussion about responding to USAID regarding labor categories on the contract, **BRITT** emailed another Apprio employee and CC-2 the following: "[W]e could keep the existing [Company 1] employees and on board the new ones directly to [Company 2]. That will eliminate many of the employee related problems we know will come up, when switching to a new firm. Even though that firm is our protege, they'll still complain." **BRITT** continued: "And given this is the Front Office, we really need to minimize any personnel issues day 1, so it doesn't impact other USAID contracts we want to pursue. Actually, we want to have the exact opposite impact. Let's sweeten up the pot for these folks so everyone wants to come to [Company 2], [Company 1] and [the Company 1 and Company 2 joint venture]. I'd rather pay them a premium and create a problem for all the other contractors."

On or about July 11, 2018, CC-1 emailed CC-2 regarding the solicitation for Contract 5. CC-2 then forwarded this email to **BRITT** and another Company 1 employee: "There aren't a lot of changes. Can you guys meet early next week to discuss? We are working on updating now." **BRITT** responded, "I'll be in DC Monday and Tuesday till 3.... I think we're good."

On or about July 24, 2018, Company 1 and Company 2 submitted a joint price proposal and technical proposal to CC-1 and another USAID employee in an effort to obtain Contract 5.

On or about September 10, 2018, CC-1 emailed CC-2, copying other USAID employees, notifying CC-2 that it had been awarded Contract 5 and requesting CC-2's signature for full execution. In the email, CC-1 addressed CC-2 as "Mr. [CC-2.]" CC-2 then forwarded the email to **BRITT**. **BRITT** responded, "Woohoo!" On or about the next day, Contract 5 was formally awarded to Company 2 as prime contractor with Company 1 as subcontractor.

In and around January 2020, **BRITT** increased the payments to CC-1 that were funneled through CC-3. More specifically, on or about January 7, 2020, CC-3 exchanged text messages with **BRITT** about having Company 1's Accountant send payments to CC-1 through CC-3: **BRITT** texted CC-3, "6500," and, "I thought it was 4000. [Company 1 Accountant] told me that number. Sheesh[.]" CC-3 responded, "Got it," and then, "Done." Then **BRITT** stated, "I gave you the wrong number. It[']s worse," and "7500." CC-3 replied, "Ok will redo[.]"

On or about January 8, 2020, **BRITT** and CC-3 continued to send text messages discussing the increased payments to CC-1:

- **BRITT** texted CC-3, "Hey, tell Your boy [CC-1] how we[']re handling this from now on. Figured [Company 1's Accountant] would tell [CC-1] to ask you." CC-3 asked, "Is [Company 1's Accountant] planning to execute payment for tomorrow?" **BRITT** answered, "I[']ll ask [Company 1's Accountant] and let you know in a bit. Just like you, our cash is tight too."

- Later that day, **BRITT** texted CC-3: "Text your friend [CC-1] and let him know we[']re setting up the new process[.] It[']s going to take til[l] tomorrow likely. I[']m guessing because [Company 1's Accountant] has been prepping for our new bank meeting and the support audit[.] This new way is a must because my financial situation has pulled

16

everything out of my control[.]" CC-3 replied, "I can take care today if I have something tomorrow[.]" **BRITT** replied, "Let me go confirm with [Company 1's Accountant]."

- Also that day, CC-3 texted **BRITT**, "Just checking to see if we are good for tomorrow. I did talk to him [CC-1]." **BRITT** replied, "We better be :)"

On or about April 10, 2020, **BRITT** emailed CC-2 with the subject, "I think we may get some USAID Training work." **BRITT** explained that he spoke with a USAID employee, and that he **(BRITT)** told the employee that Company 1 and Company 2 have an SBA-approved joint venture and that Company 2 is a member of the SBA 8(a) program. CC-2 responded that they would need to use a second joint venture between Company 1 and Company 2. **BRITT** responded, "That's what I figured. I didn't give [the employee] all that detail; I figured you and I would handle that. Just looking for as much revenue $$$$ as we can get."

On or about June 1, 2020, CC-1 awarded Company 2 USAID Contract 6 for which Company 1 served as a subcontractor.

SO STIPULATED:

Glenn S. Leon
Chief
United States Department of Justice
Criminal Division, Fraud Section

Matt Kahn
Brandon Burkart
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section

Erek L. Barron
United States Attorney
United States Attorney's Office
District of Maryland

Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Darryl F. Britt
Defendant

Joshua A. Levy, Esq.
Monique T. Abrishami, Esq.
Juliana M. Andonian, Esq.
LEVY FIRESTONE MUSE LLP
*Counsel for the Defendant*